J-S71034-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| MILTON SIMON WASHINGTON | |
| Appellant | No. 3596 EDA 2015 |

Appeal from the PCRA Order October 30, 2015
in the Court of Common Pleas of Lehigh County Criminal Division
at No(s): CP-39-CR-0000515-1987

BEFORE: BOWES, PANELLA, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:          **FILED SEPTEMBER 12, 2017**

Appellant, Milton Simon Washington, appeals from an order dismissing his fourth petition under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546 in this first-degree murder case. Appellant contends that after-acquired evidence of DNA test results exonerate him as the murderer. We conclude that the DNA evidence, examined in light of the record as a whole, does not entitle Appellant to a new trial. Accordingly, we affirm.

The victim, Tina Wyatt, was last seen alive on the night of June 29, 1986, when she left the room at the Airport Inn in Allentown, Pennsylvania that she and Appellant shared with her two children. Wyatt worked as a prostitute at the time of her death, and Appellant was her pimp. N.T.,

---

[*] Former Justice specially assigned to the Superior Court.

9/21/87, at 23-24; N.T., 9/22/87, at 118, 476-81; N.T., 9/25/87, at 963-65, 1031-33.

On the morning of June 30, 1986, Wyatt's body was discovered at the rear of a warehouse in Allentown. Defensive wounds, trauma to the head, and multiple stab wounds were readily visible. Near her body, investigators found a bloodstained two-by-four block of wood, numerous pieces of bloodstained wood, a small silver folding knife, Wyatt's wallet and comb, and a business card with the name Christopher Christian on it. Wyatt's brown corduroy jacket was draped over her head, and her pants were draped over her right ankle. Her sandals were near her body, and she was wearing her bra and sweater, both of which were bloodstained. N.T., 9/21/87, at 26-28, 52-55, 68-70; N.T., 9/22/87, at 279; N.T., 9/30/87, at 1380.

Police officers collected the wood pieces, the knife, the clothes and personal items. No physical evidence linked Appellant to Wyatt's death or the crime scene. An autopsy determined that Wyatt died from forty-nine stab wounds. She also sustained numerous blunt force injuries and other serious injuries, including a broken left radius, fractured rib and skull fracture. Defensive wounds were evident on her wrist, forearms, hands and right elbow. N.T., 9/23/87, at 521, 524, 531-47, 549, 644-45.

The state police laboratory received vaginal, anal, and gum swabs and smears, throat swabs, pubic hairs and nail clippings taken during the autopsy for biological testing. The laboratory also received blood samples

and other evidence collected at the crime scene, including the wood pieces, the knife, and the victim's clothing. Serology results indicated that some blood samples taken from the wood pieces and Wyatt's jacket and jeans were Type A. Wyatt's blood type was Type A, and Appellant's was Type B. Human blood of an "undetermined" type was on the wood pieces, knife handle and Wyatt's sweater and bra. The vaginal swab contained acid phosphatase, an enzyme found in semen and sperm. N.T., 9/22/87, at 268-71, 275-76, 279-80.

Appellant met voluntarily with police and gave three interviews, two of which he initiated. On July 4, 1986, police arrested Appellant for an unrelated parole violation. While Appellant was incarcerated in county prison, jailhouse informants came forward claiming that he confessed to killing Wyatt. As a result, Appellant was charged with homicide. N.T., 9/21/87, at 159; N.T., 9/23/87, at 716; N.T., 9/25/87, at 949-50, 987.

During Appellant's jury trial in September 1987, the Commonwealth claimed that Appellant beat Wyatt with a large piece of wood and stabbed her multiple times because he was upset that she did not want to work as a prostitute anymore. Although the Commonwealth claimed that Appellant bludgeoned Wyatt in the head and then stabbed her forty-nine times, no blood evidence was found on Appellant or in his hotel room. No Type B blood (Appellant's blood type) was found on crime scene evidence, despite evidence of Wyatt's defensive wounds sustained while trying to protect

herself. The Commonwealth highlighted inconsistencies in statements Appellant provided to the police concerning the last time he saw Wyatt, the clothes she wore the night she was murdered, and whether Appellant and Wyatt's children ate ice cream that night. N.T., 9/21/87, at 22-24, 102-03; N.T., 9/22/87, at 270-75, 280, 284, 289; N.T., 9/23/87, at 547-48, 651-53; N.T., 9/25/87, at 1005, 1008, 1015, 1021.

Much of the Commonwealth's evidence came from four jailhouse informants who claimed Appellant "confessed" to them: Juan Cruz, Benjamin Kennedy, Anthony Rish, and Andrew Gratt. All four witnesses received leniency in exchange for their testimony.

Police originally suspected the first informant, Cruz, of murdering Wyatt. Cruz testified he was staying at the Airport Inn on the night of the murder. He said he saw Appellant and Wyatt arguing on the weekend of the murder, and that Appellant slapped Wyatt and chased her in the direction of where her body was found. He also testified on direct examination that on Sunday afternoon, one day before the murder, Appellant told him he "did" "something to his lady." On cross-examination, Cruz testified Appellant said this on Saturday, two days before the murder. Cruz also said that his rooms at the Inn were either in his name or the name of his girlfriend, Gladys Acevedo. During Cruz's first interview with police, he stated that he knew nothing about Wyatt's death. In exchange for Cruz's testimony, the Commonwealth informed the sentencing judge in Cruz's criminal case about

his assistance in Appellant's case and moved for reduction of Cruz's bail. N.T., 9/21/87, at 188-89, 199-205, 219, 226, 228, 248.

Cruz's testimony was contradicted by Armin Desai, operator of the Airport Inn at the time of Wyatt's death, who testified he had no registration records for Cruz or Acevedo for June 29 or June 30, 1986. In fact, Desai had no registration records for Cruz or Acevedo in June 1986 after June 23rd. Acevedo also contradicted Cruz's testimony by testifying that she and Cruz did not stay at the Inn the weekend Wyatt died; instead, they stayed on Second Street the entire weekend. N.T., 9/24/87, at 744-48, 755, 929.

The second informant, Kennedy, Appellant's long-time friend, testified that at the time he shared a cell with Appellant, Appellant said he "accident[ally]" killed Wyatt during a fight. According to Kennedy, Appellant asked him to tell police that Cruz killed Wyatt, and that Appellant was at Kennedy's house that night. Kennedy said he decided to testify against Appellant because he heard rumors Appellant agreed to "shut up" Kennedy's wife, who planned to testify in an unrelated case. In exchange for this testimony, Kennedy's bail was reduced, and he was released from jail. N.T., 9/22/87, at 366, 369, 375-76, 378, 385.

The third informant, Rish, was an inmate at Lehigh County Prison while Appellant was incarcerated there for his parole violation. Rish claimed his friend Andrew Gratt, another inmate, knew both Appellant and Wyatt. According to Rish, Gratt was upset about Wyatt's death and wanted revenge

on Appellant. Rish said he and Gratt devised a plan to get Appellant to confess to the murder so they could tell authorities. Rish also said Appellant told Gratt he killed Wyatt because he loved her, and she made "good" money but was going to leave him. According to Rish, Appellant said his other prostitutes would "think twice" about messing with him because of what happened to Wyatt. In exchange for this testimony, Rish's bail was reduced, and he was released from jail in March 1987. N.T., 9/22/87, at 434-48.

The fourth informant, Gratt, was released on his own recognizance shortly after he and Rish contacted authorities about Appellant's alleged confession. Gratt fled Pennsylvania, and the Commonwealth could not locate him to bring him in as a witness during trial. His preliminary hearing testimony, which was consistent with Rish's trial testimony, was read into the record during trial. N.T., 9/23/87, at 574, 579-80, 583, 589, 593, 620-21.

Appellant testified in his defense and denied any involvement in the murder. He stated that he spent the night of June 29, 1986 in the motel room with Wyatt's children, except for a short time when he left to buy ice cream at a nearby store. In the early morning of June 30th, after not hearing from Wyatt for several hours, Appellant called a cab and went looking for her. While out, he saw a friend, Edward Godreau, who agreed to drive him around to search for Wyatt. At 8:12 a.m. that morning, Appellant

called the Allentown Communications Center to file a missing person report. Appellant added that Wyatt's estranged husband, Kerry Wyatt, threatened to kill her two weeks before her murder and said she would be sorry for leaving him. Detective Sergeant Suppan corroborated this, testifying there were "numerous incidents" involving Kerry Wyatt "prior to this [Wyatt's death] up until they moved away to the Airport Motor Inn . . . ah, maybe a week and a half prior. There were numerous disturbance calls that we had received, the patrol division." The parties stipulated at trial that Allentown Police Department records reflected two reported disputes between Wyatt and Kerry Wyatt. N.T., 9/21/87, at 100, 117, 131-32; N.T., 9/25/87, at 968, 971, 974-75, 980, 1091; N.T., 9/28/87, at 1146-47.

The jury found Appellant guilty of first-degree murder but could not agree on the penalty, resulting in a sentence of life imprisonment without the possibility of parole. N.T., 9/29/87, at 1327-32, 1356-57; N.T., 9/30/87, at 1508; N.T., 11/7/88, at 15.

Less than one year after sentencing, Kennedy executed a sworn affidavit recanting his trial testimony. Kennedy admitted perjuring himself during Appellant's trial and stated that "police officers gave me the information I testified to during trial." Kennedy further averred that not only had Appellant not confessed to killing Wyatt, but he actually proclaimed his innocence to Kennedy. In 1991, Kennedy invoked his Fifth Amendment

rights when called to testify at a hearing on Appellant's motion for a new trial based on after-discovered evidence. N.T., 12/16/91, at 6.

Rish also recanted his testimony by sending Appellant letters on July 19, 1990 and September 29, 1992 that he and Gratt made up the story about Appellant's confession. Rish wrote that the District Attorney's office "forced" him to testify by threatening to put him "in front of the worst judge and give [him] 5 to 10 years." Am. PCRA Pet., Ex. B (July 19, 1990 & Sept. 29, 1992 Rish ltrs.). Rish, however, never submitted a sworn affidavit.[1]

In 1989, this Court dismissed Appellant's direct appeal due to his failure to file a brief. Subsequently, Appellant filed multiple unsuccessful post-conviction petitions requesting a new trial based on Kennedy's and Rish's recantations.

On February 29, 2012, however, the Commonwealth consented to, and the PCRA court ordered, post-conviction DNA testing of numerous items of physical evidence related to this case. The court entered this order "pursuant to the agreement of the parties and the authority of the Court under 42 Pa.C.S. § 9543.1 and Pa.R.Crim.P. 902 . . ." Order, 2/29/12, at 1.

Cellmark Forensics conducted the DNA testing. On October 4, 2013, Cellmark excluded Appellant as the source of the male DNA profile obtained from the sperm on the inside crotch of Wyatt's jeans. *See* Am. PCRA Pet.,

---

[1] Rish's letter to Appellant in 1992 stated that Rish was "going into the federal system," an apparent reference to federal prison. The Federal Prisoner Locator indicates that a prisoner named Anthony Rish died in 2010.

Ex. C (Oct. 4, 2013 Cellmark Report). The state police uploaded this unidentified male DNA profile to CODIS, but it did not match the profile of any individual in the DNA databanks or establish any "investigative leads." Am. PCRA Pet., Ex. D (Apr. 10, 2014 PSP Report). There were no conclusive results from tests on numerous other items of evidence.

On November 13, 2013, Appellant, through counsel, filed his fourth PCRA petition seeking a new trial based on the DNA test results. On June 11, 2015, Appellant filed a motion to amend this petition along with an amended fourth PCRA petition.[2] On October 8, 2015, the PCRA court issued a Pa.R.Crim.P. 907 notice of intent to dismiss the amended petition without a hearing and a supporting opinion. The court reasoned as follows:

> [Appellant]'s argument is misplaced, as it is based on the incorrect assumption that the semen in the crotch area of the victim's jeans belonged to her murderer. There is no factual basis for this supposition, and therefore amounts to mere speculation. The record evidence demonstrates that the victim was a prostitute. While it is undisputed that semen was found in the crotch area of the victim's jeans, there is no evidence to establish when this semen was deposited there. Therefore, the absence of [Appellant]'s DNA is not significant, consequential, or material to a determination of [Appellant]'s guilt or innocence, and thus by no means can it be deemed exculpatory in nature.
>
> In the within matter, the evidence presented at trial and considered by the jury was sufficient to support the

---

[2] Although the court never explicitly granted Appellant's motion to amend, it implicitly granted Appellant leave to amend his fourth PCRA petition by stating later in the case that it had reviewed Appellant's November 13, 2015 petition "as amended on June 11, 2015." Pa.R.Crim.P. 907 Notice of Intent to Dismiss, 10/8/15, at 1.

verdict. The record evidence revealed that a few hours before the victim's body was discovered, [Appellant] was seen yelling at the victim for not being on the street working, and that he bit her. [Appellant] then chased the victim towards the warehouse where the victim's body was subsequently discovered a few hours later. Juan Cruz and Christopher Christian testified that the victim indicated to them that she wanted to stop being a prostitute, but she could not because [Appellant] made her continue. In addition, Benjamin Kennedy and Anthony Rish testified that [Appellant] tried to have them provide a fake alibi defense for him. Moreover, Juan Cruz, Benjamin Kennedy, and Andrew Gratt testified that [Appellant] admitted to them that he had killed the victim. In addition, this Court notes that the jury knew that there was no direct physical evidence linking [Appellant] to the crime scene or to the weapons. The jury also was aware of the fact that semen was present on a vaginal swab done on the victim. Hence, this DNA evidence offered by [Appellant] cannot be categorized as "newly-discovered," but rather corroborative in nature. As such, this Court cannot conclude that the outcome of the trial would have been different had the jury been presented with this DNA evidence.

Op., 10/8/15, at 4-5. In a footnote, the court added:

[Appellant] . . . argues that the recanted testimony of Commonwealth witnesses Benjamin Kennedy and Anthony Rish is "newly-discovered" evidence. However, this Court finds this contention to be without merit, as [Appellant] has raised this issue on multiple occasions in the past and it has been repeatedly rejected by the courts. This renewed assertion cannot be entertained by this Court yet again. Of note, the Supreme Court of Pennsylvania has found recantation testimony to be inherently unreliable evidence, and do not form a basis for any relief.

*Id.* at 5 n.3.

On October 30, 2015, the court dismissed Appellant's petition. Appellant filed a timely appeal and subsequently complied with Pa.R.A.P.

1925. The PCRA court adopted its October 8, 2015 opinion as its Rule 1925 opinion.

Appellant raises four questions in this appeal, which we have re-ordered for purposes of disposition:

> 1. Whether the PCRA court erred in concluding the DNA evidence was not exculpatory?
>
> 2. Whether the PCRA court erred in failing to consider the full record when analyzing whether the DNA evidence would have changed the outcome of [Appellant's] trial if it had been presented to the jury?
>
> 3. Whether the PCRA court's determination that the DNA evidence would not have changed the outcome of [Appellant's] trial if it had been presented to the jury is not supported by the record?
>
> 4. Whether the PCRA court erred in not considering recantations of two Commonwealth witnesses in analyzing the request for a new trial?

Appellant's Brief at 3-4.

Preliminarily, we observe that both the parties' stipulation to conduct DNA testing was timely. Agreements to conduct DNA testing are exempt from the PCRA's one-year jurisdictional time bar within section 9545(b)(1). *See Commonwealth v. Conway*, 14 A.3d 101, 108 n.2 (Pa. Super. 2011). In addition, Appellant's fourth PCRA petition was timely. When the court grants DNA testing, the petitioner must file a PCRA petition within sixty days after obtaining DNA test results. *See id.*; 42 Pa.C.S. § 9543.1(f)(1). Upon receipt of this petition, and any answer filed by the Commonwealth, "the court shall determine whether the exculpatory evidence resulting from the

DNA testing conducted under this section would have changed the outcome of the trial as required by section 9543(a)(2)(vi)." 42 Pa.C.S. § 9543.1(f)(3). Here, Appellant timely filed his fourth PCRA petition within sixty days after obtaining the DNA results. Accordingly, we turn to the issues raised in his appeal.

In an appeal from the denial of a PCRA petition, we determine whether the record supports the PCRA court's findings and whether its order is otherwise free of legal error. *See Commonwealth v. Fears*, 86 A.3d 795, 803 (Pa. 2014). We accord great deference to the findings of the PCRA court if they are supported by the record. *Commonwealth v. Boyd*, 923 A.2d 513, 515 (Pa. Super. 2007). We apply a *de novo* standard of review with regard to the PCRA court's legal conclusions. *Commonwealth v. Medina*, 92 A.3d 1210, 1215 (Pa. Super. 2014) (*en banc*).

The first three issues in this appeal essentially raise the same question: whether the PCRA court applied the wrong test in denying Appellant's fourth petition. Below is a recitation of the proper standards followed by their application to this case.

The PCRA delineates seven classes of claims that are eligible for relief under the PCRA. *See* 42 Pa.C.S. § 9543(a)(2). Of relevance here is the "after-discovered evidence" provision, which states that a claim alleging "the unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the

trial if it had been introduced" is cognizable under the PCRA. 42 Pa.C.S. § 9543(a)(2)(vi). To establish this claim, the petitioner must prove by a preponderance of the evidence that "(1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict." *Commonwealth v. D'Amato*, 856 A.2d 806, 823 (Pa. 2004); *see also* 42 Pa.C.S. § 9543(a) (setting forth preponderance standard).

DNA testing is a special form of after-discovered evidence that is governed by the detailed procedures within 42 Pa.C.S. § 9543.1. Section 9543.1(a) provides in relevant part:

> An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment . . . may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

42 Pa.C.S. § 9543.1(a)(1). Within this motion, the applicant must:

> (c) present a *prima facie* case demonstrating that the:
>
> > (i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and
> >
> > (ii) DNA testing of the specific evidence, assuming exculpatory results, would establish:
> >
> > > (A) the applicant's actual innocence of the offense for which the applicant was convicted [.] . .

- 13 -

42 Pa.C.S. § 9543.1(c)(3)(i)-(ii)(A).

Section 9543.1(d) prescribes when the court must order DNA testing and when it must not:

> (1) Except as provided in paragraph (2), the court **shall** order the testing requested in a motion under subsection (a) . . . upon a determination, after review of the record of the applicant's trial, that the:
>
>> (i) requirements of subsection (c) have been met;
>>
>> (ii) evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been altered in any material respect; and
>>
>> (iii) motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.
>
> (2) The court **shall not** order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that:
>
>> (i) would establish the applicant's actual innocence of the offense for which the applicant was convicted [.] . .

42 Pa.C.S. § 9543.1(d) (emphases added).

> [O]n its face, the *prima facie* requirement set forth in § 9543.1(c)(3) and reinforced in § 9543.1(d)(2) requires that an appellant demonstrate that there is a "reasonable possibility" that "favorable results of the requested DNA testing '**would establish** ' the appellant's actual innocence of the crime of conviction." . . . The parties to this appeal agree, as did the trial court, that the definition of "actual innocence" that is to be applied in the evaluation of the effect of new evidence is that articulated by the United States Supreme Court in its [o]pinion in **Schlup v. Delo**, 513 U.S. 298, 327 [] (1995), namely, that the newly

- 14 -

> discovered evidence must make it "more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." Thus, this standard requires a reviewing court "to make a probabilistic determination about what reasonable, properly instructed jurors would do," if presented with the new evidence. ***Id.,*** 513 U.S. at 329 . . .

***Conway***, 14 A.3d at 109 (some citations and footnote omitted). As a matter of law, an order authorizing DNA testing constitutes a *prima facie* determination that favorable test results will establish the applicant's actual innocence. ***Id.***

Within sixty days after obtaining the DNA test results, the petitioner may file a PCRA petition seeking relief on the basis of after-acquired evidence. 42 Pa.C.S. § 9543.1(f)(1). The court shall then "determine whether the exculpatory evidence resulting from the DNA testing conducted under this section would have changed the outcome of the trial as required by section 9543(a)(2)(vi)." 42 Pa.C.S. § 9543.1(f)(3). To assess whether the test results would have changed the outcome of trial, the PCRA court must assess the new evidence "in light of the evidence as a whole." ***D'Amato***, 856 A.2d 806, 825 (Pa. 2004) (emphasis added). "In making that determination, a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction." ***Commonwealth v. Padillas***, 997 A.2d 356, 365 (Pa. Super. 2010).

Even when DNA test results favor the applicant, they do not guarantee a new trial. Instead, the PCRA court must weigh "exculpatory" (*i.e.,* favorable) test results against the rest of the evidence and the reliability of the persons offering the evidence. 42 Pa.C.S. § 9543.1(f)(3); **D'Amato**, 856 A.2d at 825; **Padillas**, 997 A.2d at 365. In other words, the PCRA court must construe a favorable DNA test as providing additional support for a new trial, but not necessarily compelling one.

For two reasons, the PCRA court determined that the new DNA evidence would not change the outcome of Appellant's trial: (1) the circumstantial evidence favorable to the Commonwealth, such as the fact that Wyatt was a prostitute and there was no evidence of the time the semen was deposited; and (2) the court's view that the DNA evidence was simply "corroborative in nature," because the jury "was aware of the fact that semen was present on a vaginal swab done on the victim," and that there was "no direct physical evidence" linking Appellant to the crime. PCRA Ct. Op., 10/8/12, at 4-5. We conclude that the PCRA court balanced the evidence correctly by analyzing the new DNA evidence "in light of the evidence as a whole." **D'Amato**, 856 A.2d at 825.

Admittedly, the case against Appellant was not overwhelming. The only witnesses to implicate him in the crime—Cruz, Kennedy, Rish, and Gratt—had an incentive to finger him as the murderer to obtain their release from custody in their own cases. These witnesses had no personal

knowledge of Wyatt's death, claiming only that Appellant confessed to them while he was incarcerated with them on a parole violation. Gratt did not even show up to testify at trial. While Cruz claimed to have seen a fight between Wyatt and Appellant at the Airport Inn shortly before the murder, his testimony was demonstrably flawed. He gave varying accounts as to when he saw the two fighting, and he claimed Appellant said he "did," past tense, "something bad to his lady" on Saturday or Sunday—one to two days before her murder. Defense witnesses cast additional doubt on Cruz's testimony. Cruz's girlfriend testified he stayed with her elsewhere in Allentown that weekend. The Airport Inn operator also testified that neither Cruz nor his girlfriend was registered at the motel that weekend, despite Cruz's testimony that his practice was to register under one of their names. Further, at least one other individual had a motive to kill Wyatt: her estranged husband, who had threatened to kill her two weeks before her murder.

At the crime scene, Wyatt was found naked from the waist down, with her jeans around her ankles and semen on her jeans. There were defensive wounds on her hands and arms. No physical evidence connected Appellant to the crime scene.

Nevertheless, the DNA results did not change the complexion of the evidence enough to warrant a new trial. Although the DNA tests irrefutably excluded Appellant as the source of the semen on Wyatt's jeans, the jury

was made aware during trial that no physical evidence connected Appellant to the crime. The DNA tests merely provided further proof that there was no physical evidence of Appellant's guilt. Further, the DNA results do not demonstrate **when** the semen was deposited on her jeans. Given her profession as a prostitute, one of her customers could have deposited the semen well before she was killed. Moreover, given the evidence in this case, we are constrained to disagree with Appellant that the fact that his DNA was not found in the sperm stain would have permitted his trial counsel to mount a defense that was not already available at the time of trial. Thus, Appellant failed to prove by a preponderance of the evidence that the new evidence would likely have compelled a different verdict.

In his final argument, Appellant claims that the PCRA court erred by failing to consider the recantations of two Commonwealth witnesses, Kennedy and Rish, into its analysis of whether to grant Appellant a new trial. We hold that Kennedy's recantation does not deserve any weight, because he invoked his right against self-incrimination at an evidentiary hearing relating to his recantation. We also will not accord any weight to Rish's recantation, because he never submitted a written recantation under oath. Nor does it appear that Rish will have the opportunity to do so in the future, as he probably is deceased.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/12/2017